**FAMILY FINANCE FUND, a general partnership, Plaintiff and Appellant,**

v.

**Ray G. ABRAHAM and Tex R. Olsen, Defendants and Respondents.**

No. 17763.

Supreme Court of Utah.

Dec. 31, 1982.

Marcus Taylor, Richfield, for plaintiff and appellant.

Ken Chamberlain, Richfield, for defendants and respondents.

Ray G. Abraham pro se.

DURHAM, Justice:

The appellant Family Finance Fund (hereinafter "FFF") appeals from an order of the trial court granting summary judgment in favor of the respondent, Tex R. Olsen (hereinafter "Olsen"). That order established that Olsen, a prior purchaser, had a right of ownership to a summer cabin superior to that of FFF, even though FFF had made an earnest money deposit with the seller, Ray Abraham. We affirm the decision of the trial court.

Ray and Jolynn Abraham [1] owned a summer cabin which is located on federal land at Fish Lake in southern Utah. The federal land is regulated by the United States Forest Service. During 1980, the Abrahams advertised the sale of their cabin. On December 29, 1980, Ray Abraham gave the keys to the cabin to Mrs. Olsen so that she could inspect the cabin. At that time, Ray Abraham informed Mrs. Olsen that the purchase price of the cabin was $26,000, or $26,500 if she also wanted to purchase the redwood furniture. In addition, Ray Abraham told Mrs. Olsen that, if she did not want to purchase the cabin, she should return the keys by placing them in his mailbox. If, however, she desired to purchase the cabin on the stated terms, she was to keep the keys and to place a check for $500 in his mailbox as a good faith deposit. On that day, December 29, as agreed, Mrs. Olsen kept the keys to the cabin and placed a $500 check in Ray Abraham's mailbox.

On December 30, 1980, Ray Abraham, without checking his mailbox, showed the cabin to Merrill R. Ogden, one of the partners of FFF. After negotiations,[2] Mr. Ogden prepared an Earnest Money Receipt and Offer to Purchase agreement naming FFF as the purchaser and Ray Abraham as the seller. The agreement was signed by Ray Abraham and was accompanied by a $500 check representing FFF's earnest money deposit. Also, on December 30, 1980, Ray and Jolynn Abraham reduced to writing the December 29 contract of sale of the cabin to the Olsens. The Abrahams also executed the documents necessary to transfer the cabin, which documents were filed with the United States Forest Service on January 2, 1981.

On January 2, 1981, Ray Abraham returned FFF's $500 earnest money check to Mr. Ogden. At that time, Ray Abraham informed Mr. Ogden that his wife, Jolynn, would not sign any of the documents necessary to transfer the cabin to FFF.

On February 20, 1981, FFF filed suit asserting two causes of action. Its first cause of action was against Ray Abraham for specific performance of the Abraham-FFF contract. Ray Abraham did not file an answer to this claim. The second cause of action sought to establish FFF's right of ownership to the cabin as against Olsen. Olsen filed a Motion for Summary Judgment claiming a right of ownership to the cabin as a prior purchaser superior to that of FFF. The trial court granted Olsen's motion. FFF now appeals that decision.

On appeal, FFF advances several points of error by the trial court in granting Olsen's Motion for Summary Judgment. First, FFF claims that the sale of the cabin involves the sale of real property, and therefore, the oral contract between the Abrahams and the Olsens violates the statute of frauds. See U.C.A., 1953, §§ 25–5–1 & –3. Second, FFF claims paramount title because it was the first to record its interest in the cabin. See U.C.A., 1953, §§ 57–3–1 to –10 (1974 & Supp.1981). Third, FFF

---

1. FFF raises an issue as to whether Jolynn Abraham owns an interest in the cabin. However, as discussed, *infra,* that issue is irrelevant to the disposition of this case.

2. Olsen claims that during the negotiations Ray Abraham informed Mr. Ogden that his wife,

Jolynn, was a co-owner and might not agree to the terms of the sale of the cabin to FFF. FFF denies any such statement. However, as discussed, *infra,* it is not necessary to the disposition of this case to resolve this dispute.

asserts that the granting of summary judgment was improper because genuine issues of material fact exist as to whether Jolynn Abraham owned an interest in the cabin and as to whether Ray Abraham and Olsen contracted on December 29, 1980.

■ The answer to FFF's first point of error requires a close examination of what the Abrahams are actually selling. The Abrahams own a cabin which is located on federal land pursuant to a Forest Service "Term Special Use Permit" (hereinafter "permit"). Federal statute provides that the Secretary of Agriculture may issue such permits for the use and occupancy of portions of Forest Service land for the purpose of constructing or maintaining summer homes thereon. *See* 16 U.S.C.A. § 497(b) (1974). Although the permit gives the permittee the right to use and occupy the land, such permits are not transferable:

> Although 36 CFR [§ 251.59] provides that special-use permits may be transferred, it is not the policy to do so. Upon *sale and transfer of the improvements* covered by a special-use permit, the permit will be cancelled. Upon application and presentation of proof of ownership, a new permit may be issued to the new owner, provided continuation of the use is desirable. The new permit will contain any new conditions or stipulations which circumstances may warrant.
>
> . . . .
>
> The Forest Service does not require its permittees to obtain its consent to the *sale of improvements,* nor does the Service require that it be notified when a sale and transfer are made, as *improvements are the personal property of the permittee.* However, *there is no obligation on the part of the Service to issue a new permit to the persons acquiring the improvements.*

U.S. Dep't of Agriculture, Forest Service Manual § 2716.1 (1972) (emphasis added). Furthermore, paragraph 12 of the 21 conditions enumerted on the reverse side of the Abrahams' permit states:

> *This permit is not transferable.* If the permittee through voluntary sale or transfer . . . shall cease to be the owner of the physical improvements . . . and is unable to furnish adequate proof of ability to redeem or otherwise reestablish title to said improvements, this permit shall be subject to cancellation. But if the person to whom title to said improvements shall have been transferred in either manner above provided is qualified as a permittee, and is willing that his future occupancy of the premises shall be subject to such new conditions and stipulations as existing or prospective circumstances may warrant, his continued occupancy of the premises may be authorized by a permit to him if in the opinion of the issuing officer or his successor, issuance of a permit is desirable and in the public interest.

(Emphasis added). Thus, although the permittee may facilitate the termination of his/her permit and the issuance of a new permit, the permittee cannot convey or transfer the permit itself. Rather, the permittee may only transfer the improvements.

■ FFF relies on *Oregon Summer Home Owners' Assoc. v. Johnson,* 265 Or. 544, 510 P.2d 344 (1973), for the proposition that the permits, such as the one held by the Abrahams, are real property. FFF argues that the Abraham-Olsen contract is therefore a conveyance of real property. However, even if we assume that the permit held by the Abrahams is properly classified as real property, FFF's argument fails because the permit cannot be conveyed. The cabin is all that the Abrahams are able to convey. Therefore, the determination of whether the Abraham-Olsen contract constitutes a conveyance of real property depends on whether the cabin, not the permit, is properly classified as real or personal property.

■ Although the Forest Service Manual provides that the "improvements are the personal property of the permittee," U.S. Dep't of Agriculture, Forest Service Manu-

al § 2716.1 (1972), state law is determinative of whether the cabin is properly characterized as real or personal property. Buildings are generally treated as fixtures and are considered a part of the realty to which they are attached. *See* 1 G. Thompson, *Commentaries on the Modern Law of Real Property* § 69 (1980); 35 Am.Jur.2d *Fixtures* § 78 (1967). However, it is possible for a building to remain a chattel, especially where the parties intend or agree that the building remain personal property. *See Workman v. Henrie,* 71 Utah 400, 266 P. 1033 (1928). *See also Maricopa County v. Novasic,* 12 Ariz.App. 551, 473 P.2d 476 (1970); *Lilenquist v. Pitchford's Inc.,* 269 Or. 339, 525 P.2d 93 (1974); 1 G. Thompson, *supra,* § 69. This Court has previously stated that:

> The rule seems to be well settled that, in case of buildings or other improvements erected on another's land, if built with the consent of the landowner that they should remain the personal property of the builder, the agreement may be oral, for in such case the character of the building as personalty is fixed before attachment to the realty, and the agreement involves no sale of an interest in the land. . . . Under such circumstances, the building remains the property of the person annexing it, and may be removed by him. In considering whether a structure annexed to land is itself legally a part of the land, the chief determining factors are the mode of attachment or annexation, the character of the structure, and the intention of the person making the annexation, which generally is regarded the most important or controlling factor, and the mode of annexation and the character of the structure merely as evidence on the question of intention.

*Workman v. Henrie, supra* 71 Utah at 405–06, 266 P. at 1035 (1928) (citations omitted). Thus, in Utah, the determination of whether an item is characterized as a fixture or as personal property depends primarily on the intent or understanding of the parties. *See*

*Paul Mueller Co. v. Cache Valley Dairy Assoc.,* Utah, 657 P.2d 1279 (1982); *Workman v. Henrie, supra. Accord Garrison General Tire Service, Inc. v. Montgomery,* 75 N.M. 321, 404 P.2d 143(1965).

■ In the present case, the Forest Service issued a permit to the Abrahams which allowed them to construct a summer home on a specific parcel of property. Both the Abrahams and the Forest Service understood that the cabin was to remain the personal property of the Abrahams and was to be removed by the Abrahams on the termination of the permit. Paragraph 15 of the conditions enumerated on the reverse side of the Abrahams' permit states as follows:

> [U]pon abandonment, termination, or cancellation of this permit, the permittee shall remove within a reasonable time all structures and improvements except those owned by the United States. . . . If the permittee fails to remove such structures or improvements within a reasonable period they shall become the property of the United States . . . .

*See also* 36 C.F.R. § 251.60(j) (1981). Furthermore, the Forest Service Manual specifies that the "improvements are the personal property of the permittee." U.S. Dep't of Agriculture, Forest Service Manual § 2716.1 (1972). Thus, the clear intent and understanding of the Abrahams and the Forest Service was that the cabin was not to become a fixture, but rather, was to remain the personal property of the Abrahams.

As a result, the transfer of the cabin by the Abrahams to the Olsens was a transfer of personal property rather than real property. FFF's first and second points of error, which are based on characterizing the Abraham-Olsen contract as involving the conveyance of real property, are therefore without merit. However, the Abraham-Olsen contract may still violate the statute of frauds.

The oral contract of December 29, 1980, appears to violate the statute of frauds

provisions contained in either U.C.A., 1953, § 70A–1–206 or § 70A–2–201(1). The question arises, however, as to whether FFF may assert the statute of frauds as a defense to a contract to which it is not a party. FFF relies on 73 Am.Jur.2d *Statute of Frauds* § 577 (1974), as authority permitting it to assert the statute of frauds as a defense to the enforceability of the Abraham-Olsen contract. Corbin, in his treatise on contracts, states the same rule as follows:

> Successors in title to one who has made a contract unenforceable as against himself by reason of the statute [of frauds] can take advantage of the statute [of frauds] in the same way that the contractor himself could have done. Such successors are the contractor's grantee, heir, and personal representative. The rule is applicable to both land and chattels. Thus, if a vendor makes an oral contract to convey to A, and then later conveys the land to B, the conveyance to B is fully operative as against A. In so far as the statute [of frauds] gave to the vendor the privilege of keeping the land despite his oral contract, he can convey a like privilege to his grantee. In so far as the vendor still had legal or equitable title, he had power of conveyance of title to B. This is the case even though B, the grantee, had actual knowledge of the oral contract with A. The vendor himself had such actual knowledge; and he can put his grantee in as good a position as he himself was in. No doubt if there had been such part performance as to make the oral contract specifically enforceable, a grantee with notice would lose the land. If the vendor makes a sufficient memorandum of his oral contract after the conveyance to B, the contract then becomes enforceable against him; but it does not affect the title of B. If the vendor is not given the power to pass good title to a purchaser, the land or goods would be unsalable. Such a recognition of the oral contract by the law would not be in conflict with the words of

the statute [of frauds]; but it would tend strongly to enforcement and it has generally been thought to be in conflict with the purpose of the statute [of frauds].

2 A. Corbin, *Contracts,* § 292 at 62–64 (1950) (citations omitted).

 Thus, under this rule, it would appear that FFF could assert the statute of frauds to prevent the enforcement of the oral contract between the Abrahams and the Olsens. However, 73 Am.Jur.2d *Statute of Frauds* § 577 (1974), cited and relied on by FFF, does not set forth the rule in its entirety. Corbin continues:

> The above result is not reached, however, in case B has only a written contract subsequent to the oral contract with A, and the vendor makes a deed of conveyance to A. B's contract was and still is enforceable against the vendor; but the validity of A's oral contract is sufficiently recognized by the law to make a conveyance to him take precedence over B's executory written contract.

2 A. Corbin, *Contracts* § 292 at 64 (1950) (citations omitted). *See also* 3 S. Williston, *A Treatise on the Law of Contracts* § 529 at 741–43 (3d ed. 1960). Thus, because the Abrahams actually transferred the cabin to the Olsens, that transfer takes precedence over FFF's executory contract and the statute of frauds is inapplicable.

 In its final assertion of error, FFF claims that several genuine issues of material fact exist which render the granting of summary judgment improper. FFF asserts that a genuine issue of material fact exists as to whether Jolynn Abraham owns an interest in the cabin. However, that factual issue has relevance only with respect to the enforceability of the contract between Ray Abraham and FFF. Even assuming that that contract is enforceable without Jolynn Abraham's signature, as we have already discussed, the actual conveyance of the cabin to the respondent and his wife takes precedence over the appellant's executory contract. *See* Corbin, *supra;* Williston, *supra.* Thus, the questions of whether Jolynn Abraham owns an interest in the cabin and whether she should have participated in the contract executed by FFF and

Ray Abraham are irrelevant to the disposition of this case and the determination that the Olsens have superior title.

Finally, FFF claims that a genuine issue of material fact exists as to whether Olsen and the Abrahams had an oral contract as of December 29, 1980. Olsen has provided evidence that such a contract existed as of December 29, 1980, whereas FFF has offered no controverting evidence other than a naked claim of disbelief as to the existence of the December 29 contract. Such a claim of disbelief is insufficient to raise a genuine issue of material fact which would preclude the granting of summary judgment. *See Olwell v. Clark,* Utah, No. 17595 (filed November 10, 1982); *Dupler v. Yates,* 10 Utah 2d 251, 351 P.2d 624 (1960).

All other issues raised by FFF are without merit. We therefore affirm the trial court's granting of summary judgment in favor of Olsen. No costs awarded.

HALL, C.J., and STEWART, OAKS and HOWE, JJ., concur.